# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LATRELL DEMETRIUS WINDOM,

      Petitioner,

v.

GREG SKIPPER,[1]

      Respondent.

_____/

CASE NO. 2:16-10276
HONORABLE PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER DENYING (1) THE PETITION FOR A WRIT OF HABEAS CORPUS, (2) A CERTIFICATE OF APPEALABILITY, AND (3) LEAVE TO APPEAL *IN FORMA PAUPERIS*

Latrell Demetrius Windom, ("petitioner"), presently incarcerated at the

Michigan Reformatory Prison in Ionia, Michigan, seeks the issuance of a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed through

counsel, James Sterling Lawrence, petitioner challenges his conviction of

second-degree murder as to Tim Baker, M.C.L.A. § 750.317, two counts of assault

with intent to murder as to Remecoe Baker and Shadrekis Jackson, M.C.L.A. §

750.83, and felony-firearm, M.C.L.A. § 750.227b. For the reasons stated below,

_____

    [1] The Court amends the caption to reflect the current warden of petitioner's incarceration.

1

the application for a writ of habeas corpus is DENIED WITH PREJUDICE.

# I. BACKGROUND

Petitioner was convicted of the above offenses following a jury trial in the Genesee County Circuit Court. He was tried together with codefendants Devonte Dwayne Reid and Quentin Lamar Green, but in front of separate juries. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009).

> This case arises out of a fatal shooting that occurred on December 12, 2010, at the home of Tim Baker (Baker) on West Ridgeway in Flint. Remecoe Baker (Remecoe), Baker's nephew, did not have to report to work at McDonald's that day because there was a snow storm. Remecoe picked up his girlfriend, Jackson, and took her to Baker's house. Remecoe and Jackson watched a movie on his uncle's couch and both fell asleep.

> Remecoe was woken up by a knock at the door and heard "a bunch of footsteps just running—seem like running in the house." Remecoe was shot less than ten seconds later in the hand and arm. He passed out and then woke up again when he heard a gunshot outside. Jackson was lying on the floor and had also been shot. Remecoe could not say how many individuals came in and could only describe one as wearing a red hoodie.

> Jackson was woken up when she heard Baker's cell phone ring. She fell back to sleep and then heard a knock on the door. Baker opened the door and let someone in. The two men were standing at the door when "some more people came ... they just opened the door and walked in." A man said "don't move and they just started shooting." Jackson was shot in the leg and neck and rolled from the couch to the floor. The shooting moved to the outside of the house. Jackson could not move; she played dead so

that they would not do something else to her. After the shooting outside stopped, several individuals came back into the house. Jackson thought there were four individuals. All of the individuals were dressed in black, except for one man who was in a red hoodie. She heard the man in the red hoodie say "I just killed this b* * * *." She also heard them talking about looking for something. They rummaged through the house and they also checked the basement.

Remecoe had run for cover under the basement stairs. At least two individuals came back into the house and into the basement. One voice said to "go back upstairs and check, finish checking." The individual in the red hoodie was trying to get out the back door. Remecoe could hear people upstairs "tearing stuff up and one saying I didn't try to shoot—shoot to kill this b* * * *."

Shelly Conway lived next door to Baker. On the night of the shooting, she noticed a vehicle parked in front of Baker's house. She heard gunshots and then Baker crawled to her house. He had been shot multiple times. Once he was safely in her home, Conway called 911. At first Baker was able to talk, but then he lost consciousness. Conway testified that "[t]he only thing I seen was at that car it was a young fella, um getting in the driver side and he took off ..." Conway saw the man get into the car, but was not sure whether she saw him shooting. He was wearing dark clothing—red or gray. In a statement to police, Conway stated that the man had a gun. The man was yelling something, but she could not discern what he was saying. Conway "can't put a face to—to no one in particular that night."

Benny Goodman testified that he lived across the street from Baker. On the night of the shooting, Goodman was playing video games when he heard gunshots. Shootings in the neighborhood were a matter of course, so he was not particularly alarmed. Goodman first looked out the window and then went outside to get a better view. Goodman observed Baker and three other individuals "exchanging gun fire." Baker was standing on his porch and the other individuals were in Baker's driveway. Goodman also observed a car that "took off when I first looked out the window." It appeared to be a black Grand Am and the driver was wearing dark clothing. The three other individuals were

running from Baker's house to the driveway. They were also dressed in dark clothing and one was wearing a distinctive red hoodie. Goodman observed four guns—one in Baker's hands and one in each of the three men's hands. He could not say whether the driver of the vehicle also had a gun. Goodman watched as Baker fell to the ground and crawled to a neighbor's house. Two of the individuals went back into Baker's house and the one wearing the red hoodie ran around the side of the house. Goodman observed the individual in the red hoodie after he was taken into police custody.

Officers had received a dispatch to the home on Ridgeway in response to the shooting. Defendants Green and Windom were apprehended after a foot chase. Defendant Reid was found under an overhang approximately three houses down the street from Baker's home. None of the defendants had a gun in their possession at the time of their arrests.

Corey Bracey–Bradley testified that he was the driver that day and was testifying against his co-defendants as part of a plea agreement with the prosecutor. On the night in question, Bracey–Bradley met up with Green and Windom. Bracey–Bradley was driving his girlfriend's grandmother's navy blue Impala. All three men were wearing black. They drank some cough syrup and smoked "a couple blunts" of "weed." Green suggested they buy more weed so "we got to callin' people and see if we could find some weed." Green found someone "on Ridgeway."

Bracey–Bradley testified that, even though Green had money "our plans wasn't to buy no weed." Instead, they were planning to "rob the weed house." They stopped at the store where Green bought cigarettes and then picked up defendant Reid, who was wearing a red hoodie. "Everybody" was armed but Bracey–Bradley was not sure "who had what gun." Bracey–Bradley had his own gun—a .40 caliber—and Green had two guns, one of which he handed to Reid when they arrived at the weed house. Bracey–Bradley acknowledged that Reid got into the car after the plans to rob Baker were finalized, but that Green handed Reid a gun and said "we're gonna go hit this lick."

Bracey–Bradley testified that once they got to the home on Ridgeway, the plan was to "get the door open." Bracey–Bradley and Reid went to

the door first. The plan was for Windom and Green to come in behind them after the door was open. A man with dreadlocks answered the door. Bracey–Bradley explained that "after he seen the other people coming in behind us, he tried to grab me by the throat" and scratched Bracey–Bradley's neck. Bracey–Bradley "swiped [Baker's] hands down and took off." Windom and Green came in and shouted "nobody move." Bracey–Bradley heard gunshots as he was running back to the car, which was parked right in front of the house. He denied firing any shots.

In terms of physical evidence found while tracking the footprints in the snow, officers retrieved a black stocking knit cap, black ski mask, part of a sleeve or jacket cuff, and a .45 caliber gun. The physical evidence found in the home consisted of four bullets in the front door and eight spent .40 caliber shell casings from the living room floor. Clothes were scattered, dresser drawers were open, and the stove had been pulled away from the wall. Officers did not find shell casings outside because of the significant snowfall.

Testing of the .45 caliber gun found in the snow revealed that there were eleven live rounds and one bullet was missing. No usable fingerprints were recovered from the gun, but DNA evidence was compared to those of all the defendants. Baker and Reid were excluded as donors, but the known reference samples of Green, Windom and Bracey–Bradley could not be excluded as possible donors to the DNA. A .45 caliber bullet was taken from Baker's body in the autopsy, but it was not clear whether it came from the gun that was found. Another bullet from the victim came from a .40 caliber gun. Based on testing, the medical examiner concluded that over three handguns were used—at least one .45 caliber and at least two .40 caliber.

The officer in charge of the case, Sergeant Mike Angus, had the opportunity to interview each of the three defendants. Each of the defendants' stories changed numerous times. Green gave a written statement admitting that they went to the home on Ridgeway to buy weed. Green denied knowing that the plan was to rob Baker, though he knew that Reid was armed with a .40 caliber gun. Green initially stayed in the car, but then went to the front door to see what was taking so long. He got part way there when he heard gunshots. After the shooting, Green

went back into the house with Reid and Windom. Reid nudged Jackson and said "I just shot this b* * * *." Green ran in the backyard when police arrived. He denied ever having a weapon that day.

Like Green, Reid changed his story during the interviews. Initially, Reid denied knowing anything about the shooting. Later, Reid revised his statement. He could not remember who was driving, but described an Impala. The men were originally planning to buy a pound of marijuana, which would have cost approximately $1,000. Reid told Angus that he, Bracey–Bradley and Windom approached the house. Reid went to use the bathroom and when he came out the homeowner got into a "tussle" with the driver. Gunfire ensued and they all ran out the front door. Angus testified about a letter that Reid wrote to Windom while awaiting trial. It suggested that Windom change his statement.

In Windom's statement to Angus, he indicated that he was with Green on foot at the time of the shooting. They were going to "get some weed." At some point, an individual wearing red joined them, whom he identified as "Tayo" (Reid). They were on Ridgeway when Baker yelled out to them from his porch, asking if they wanted to buy some weed. When they said "no," Baker became belligerent and began to shoot at them. Initially, Windom told Angus that only Reid had a gun. Windom later admitted that he had a .45 caliber handgun. In a different version, Windom told Angus that while Green was planning on buying marijuana, Reid said he was going to "take" it. Windom was not sure if Reid was serious. The plan was for Reid and Green to approach the homeowner and Windom would wait outside. Reid and the homeowner started arguing once inside the house. Windom stepped into the house to see what was going on. The homeowner fired a gun and Reid fired back. Windom admitted to shooting one round out of his .45. They went back into the house after the shooting to look for people or weed in the basement. Angus told Windom that a gun was recovered near the scene. Windom admitted it was his and also indicated that Green's DNA might be found on it because Green also handled the gun. At no time in any versions of events did Windom mention Bracey–Bradley, although he did reference an Impala.

*People v. Reid*, No. 312091, 2014 WL 1614524, at *1–4 (Mich. Ct. App. Apr. 22,

2014).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 497 Mich. 889, 854

N.W.2d 883 (2014).

Petitioner seeks a writ of habeas corpus on the following grounds:

I.     Denial of Due Process and Fundamental Fairness by erroneous admission of letter without redaction to the jury that had prejudicial and injurious effect on the jury.

II.    Petitioner denied right to accept plea offer due to ineffective assistance of counsel.

III.   Denial of 6th Amendment rights by Counsel's Failure to seek suppression of statement to Sgt. Angus.

IV.    Sentence is invalid being based upon inaccurate and erroneous view of the law by the sentencing judge.

V.     It was unconstitutional not to grant relief where petitioner was denied a fair trial by courtroom deficiencies and an inadequate record for appellate review.

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), imposes the following standard of review for

habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

>(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state

court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

## III. DISCUSSION

### A. Claim # 1. The inadmissible evidence claim.

Petitioner alleges that he was prejudiced by the admission into evidence of the following letter that he wrote to the trial court judge:

> Dear Honorable Judge Neithercut. First off, I would like to introduce myself. My name is Latrell Windom. I am eighteen years old, born in the City of Flint. I was previously attending Northwestern High School before I got incarcerated into the Genesee County Jail. But at this present time I am pursuing my GED and attending church services faithfully. I was raised in a single-parent home with three siblings; two brothers, one sister. To be honest, I never knew or knew of my father. My mother always had been a supporting parent at all times, very active in my life. I'm not a bad child, just made a bad decision in life. It could cost me my life. My mother always had a good quote that she would tell me, (inaudible), the truth shall set you free. And I am not justifying my behavior that I was wrong. I plea for your mercy that you would grace upon me. I already asked the Lord to forgive me and I plead, your Honor, that you will forgive me as well for the one bad decision that I have made in my life. Sorry for the role I played in committing this crime. I beg you for a sentence that will allow me to see my mother and streets once again. While inside this County Jail I was told that you are a good-hearted, fair Judge. The Prosecutor will not work with me, but,

yes, I am willing to do the right thing. Your Honor, please, can you have mercy up on me? Sincere[ly], Latrell Windom.

*People v. Reid*, 2014 WL 1614524, at *17.

Petitioner argues that his letter was inadmissible pursuant to M.R.E. 408, because the letter was an offer to compromise which is inadmissible. Petitioner further claims that the letter was inadmissible pursuant to M.R.E. 410 because plea discussions or negotiations are inadmissible.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Thus, errors in the application of state law are usually not questioned by a federal habeas court.

A state court's ruling on the admissibility of evidence pursuant to Rule 410 is non-cognizable on federal habeas review. *See Frazier v. Mitchell*, 188 F. Supp. 2d 798, 831 (N.D. Ohio 2001); *aff'd in part and rev'd in part on other grds,* 343 F.3d 780 (6th Cir. 2003). Nothing in the text of Federal Rule of Evidence 410 or its Michigan counterpart refer to any federal constitutional right, s*ee Beach v. Moore*, 343 F. App'x 7, 11 (6th Cir. 2009). Petitioner would thus not be entitled to habeas relief merely because the admission of his statement violated M.R.E.

10

410.

Furthermore, 410 bars the admission of plea discussions only "with an attorney for the prosecuting authority..." *See* Fed. R. Evid. 410(a)(4). Any other communication would not implicate this evidentiary bar. *See United States v. Aponta-Suarez*, 905 F.2d 483, 493 (1st Cir. 1990); *see also United States v. Cross*, 1992 WL 48009, p. 4, 956 F.2d 1164 (6th Cir. Mar. 13, 1992)(Table).

In *United States v. Bauzo-Santiago*, 867 F.3d 13 (1st Cir. 2017), the First Circuit rejected an identical claim finding that the letter must be "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea..." The court then added:

> But here's the rub: the rule was amended in 1979 to clarify that it only excludes statements made to "an attorney for the prosecuting authority." Fed. R. Evid. 410(a)(4); *see id.* advisory committee's note to 1979 amendments (rule changed to mirror Fed. R. Crim. P. 11).
> *******************************************************
> The substance of Rule 410 hasn't changed since. These advisory committee notes confirm that the "legislative intention" behind Rule 410 is reflected in the "language [Congress chose]"—to exclude only statements made to an attorney for the prosecuting authority. *Rivera*, 131 F.3d at 226 (citation omitted). The amendment was designed to limit the scope of the rule by describing who the statement must be made to, and remember, we must read this amendment to create a substantive change in the law. *See Blake*, 136 S. Ct. at 1858. So, the 1979 amendments doubly foreclose Bauzó's argument.

*United States v. Bauzo-Santiago*, 867 F.3d at 20.

Rule 410 does not bar admission into evidence petitioner's letter to the trial court judge.

Petitioner cites to Rule 408 and *McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013) for the proposition that 408 of the federal rules of evidence can bar the admission of settlement negotiations in a criminal case. (Petr.'s Brief, Dkt. # 5 at Pg ID # 86-87). Rule 408 pertains to "compromise negotiations or statements surrounding a civil case." Petitioner's letter to the judge pertains exclusively to asking for mercy and leniency during sentencing in connection with his criminal case. No plea offers are mentioned in petitioner's letter to the trial court judge. *People v. Reid*, 2014 WL 1614524, at *17. Moreover, circuit court precedent does not constitute "clearly established federal law, as determined by the Supreme Court." *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014). *McAuliffe*, is a circuit court case. Rule 408 and *McAuliffe* are inapplicable.

Petitioner's first issue is non-cognizable for habeas review. Furthermore, admission of the letter into evidence at trial did not violate Rule 410 or Rule 408. Petitioner's first claim is without merit.

**B. Claims ## 2 and 3. The ineffective assistance of counsel claims.**

The Court will consolidate petitioner's second and third claims together for judicial economy. In his second claim, petitioner argues that his counsel was ineffective during the plea bargaining process. In his third claim, petitioner alleges that counsel was ineffective by failing to suppress the statement given to Sgt. Mike Angus.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

In the context of an ineffective assistance of counsel claim involving a defendant having rejected a plea offer from the prosecution, in order to establish that he or she was prejudiced by counsel's alleged deficiency, the defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court, i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances. The defendant must also show that the court would have accepted its terms, and that the conviction or sentence, or both, would have been less severe than under the judgment and sentence that in fact were imposed. *Lafler v. Cooper*, 566 U.S. 156, 164 (2012). In addition, a court, in determining the remedy for ineffective assistance of counsel relating to defendant's rejection of a plea offer, may take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her

action. *Id.* at 171.

In his brief, petitioner alleges that "counsel's performance was deficient and the actual record demonstrates support for this claim justifying an evidentiary hearing wherein he would have taken the deal, offered to all, that of 11 years for conspiracy and 2 years for the firearm, as Corey Bracy-Bradley had done. (Volume VI, 6/13/12, 12)." *See* petitioner's habeas brief, Dkt. # 5, Pg ID 99.

The trial court granted petitioner a *Ginther* hearing on petitioner's ineffective assistance of counsel claim in connection with the alleged failure to convey a plea deal.[2]

Following the hearing, the trial court judge entered an order rejecting petitioner's claim finding that "petitioner failed to show that the prosecutor made a sentencing offer of eleven years plus two." *People v. Windom,* No. 11-29466-FC, pp. 1 (Genesee County Cir. Ct. Sept. 11, 2013)(Dkt. # 5-3, Pg ID 125). The court rejected petitioner's ineffective assistance of counsel claim "because no eleven plus two year offer was made and because Attorney Feaster testified that he notified defendant of any known offers." (*Id.* at 3)(Dkt. # 5-3, Pg ID 127).

In rejecting petitioner's claim, the trial court judge referenced the testimony given by Assistant Prosecuting Attorney Gladys Christopherson, who testified that

---

[2] *People v. Ginther*, 390 Mich. 436, 443; 212 N.W.2d 922 (1973).

"no eleven plus two year offer was made to defendant Latrell Windom." (*Id.* at 2)(Dkt. # 5-3, Pg Id 126).  Christopherson further testified "that offer was only extended to Bracy-Bradley because the prosecutor believed he was the least culpable." *Id.*  The trial court judge also referenced trial counsel, who testified that "before trial started any plea bargain offer was involving twenty-two plus two years." *Id.*  Trial counsel further testified that he "attempted to get the same deal as defendant Bracy-Bradley, but he could not." *Id.*  Moreover, the trial court judge referenced Petitioner's testimony which indicated that "he was willing to take an eleven year deal, but nothing more." *Id.*

Petitioner has failed to show that a plea offer of eleven years plus two years for the felony-firearm conviction was offered to him by the prosecutor.  Petitioner has also failed to show that he would have accepted the plea of twenty-two plus two, brought to him by trial counsel.  The record reflects that no offer of eleven years plus two years was extended to petitioner by the prosecutor and that trial counsel presented the higher end offer of twenty-two plus two, which was rejected by petitioner.  Petitioner's second claim is without merit.

In his third claim, petitioner argues that trial counsel was ineffective by failing to seek the suppression of a statement made to Sergeant Mike Angus.

Petitioner submits that he made an involuntary statement to Sergeant Angus because he was forced to remain in wet clothing on a cold winter day. The Michigan Court of Appeals in rejecting petitioner's claim found that the trial court held a hearing on petitioner's motion to suppress the statement "based on Windom's 'intoxication' at the time the statement was taken." The judge denied petitioner's motion to suppress. At trial, Sgt. Angus testified before the jury that petitioner was cold during the interview. "He advised Windom to take off his damp clothing and rub his hands together for friction. Windom subsequently indicated that he was fine." *People v. Reid*, 2014 WL 1614524, at *22.

In rejecting petitioner's ineffective assistance of counsel claim, the Michigan Court of Appeals reasonably found:

> [T]here was nothing from the record which would lead to the exclusion of Windom's statement to police. Windom appeared to be sober. He had a chance to rest between the time of his arrest and the interrogation. Although he may have been cold at the start of the interview, he later indicated that he was fine. There is nothing to suggest that Windom's statement was involuntary. As such, trial counsel was not ineffective for failing to pursue a meritless position.

*People v. Reid*, 2014 WL 1614524, at *22.

Petitioner is not entitled to relief on his claim for several reasons.

First, although defense counsel did not file a pre-trial motion to suppress the evidence, counsel did bring a motion during the middle of trial to suppress

petitioner's statement, which was denied. Counsel's strategy in challenging the voluntariness of the statement mid-trial rather than in a pre-trial motion is reasonable and defeats petitioner's claim. *See e.g. Garcia-Dorantes v. Warren,* 769 F. Supp. 2d 1092, 1106 (E.D. Mich. 2011).

Secondly, the trial judge and the Michigan Court of Appeals both concluded that there was no basis for suppressing petitioner's statement to Sergeant Angus. Because petitioner has failed to identify a legal basis for the suppression of his statement, counsel was not ineffective in failing to move for its suppression prior to trial. *See e.g. Brown v. Mckee,* 231 F. App'x 469, 475 (6th Cir. 2007). Petitioner also cannot show that he was prejudiced by counsel's performance in challenging the voluntariness of the statement solely on the ground that petitioner was intoxicated and not on the additional ground that he was cold and wet because the suppression motion would have been denied even had counsel presented this additional evidence. *See Brown v. Berghuis*, 638 F. Supp. 2d 795, 823 (E.D. Mich. 2009).

Petitioner is not entitled to relief on his third claim.

**C. Claim # 4. The sentencing claim.**

In his fourth claim, petitioner alleges that he was sentenced on the judge's erroneous belief that a life sentence was mandatory and no lesser sentence was

18

permitted.

The record clearly reflects that the trial court judge addressed the available sentencing options as follows:

> The Court: I have not gone beyond the guideline range, it is a choice. It is either guidelines or life. And I'm sentencing him consistent with Mr. Reid who also had a life sentence.

(T. 7/31/2012, p. 13).

The judge reviewed petitioner's prior record before imposing sentence. Unlike codefendant Reid, petitioner had an extensive criminal record. The prosecution also indicated that the jury voted 11-1 in favor of a felony murder conviction, the one hold out juror being in the same "position of that poor grieving mother whose son was being sent to prison." *Id.* at 4-5. The trial court judge clearly articulated the sentencing options available prior to imposing petitioner's sentence.

Although the trial court judge articulated his sentencing options and the reasons for the sentence imposed, a sentence imposed within the statutory limits is not generally subject to habeas review. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Robinson v. Stegall*, 157 F. Supp. 2d 802, 823 (E.D. Mich. 2001).

Petitioner is not entitled to relief on his sentencing claim.

## D. Claim # 5. The courtroom deficiencies/inadequate transcript.

In his fifth claim, petitioner alleges that he was denied a fair trial due to courtroom deficiencies and an inadequate record for appellate review. Petitioner's claim is based on instances within the transcript where the words were "inaudible."

The Sixth Circuit has stated that "federal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice." *See Scott v. Elo*, 302 F.3d 598, 604 (6th Cir. 2002)(citing *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986)). Although the Sixth Circuit has recognized the difficulty in demonstrating prejudice where the transcripts are missing, a habeas petitioner must nonetheless "present something more than gross speculation that the transcripts were requisite to a fair appeal." *See Bransford,* 806 F.2d at 86. Petitioner alleges that he was hampered in preparing his appeal due to instances of "inaudible" testimony. The Michigan Court of Appeals reasonably found that petitioner failed "to cite any instances in which his appellate counsel was hampered by a lack of a record. We found the record adequate and did not find any deficiencies." Although a state must afford an indigent criminal defendant a record of sufficient completeness to permit proper review of his claims on appeal, a "'record of sufficient completeness' does not translate automatically into a

complete verbatim transcript." *Mayer v. City of Chicago,* 404 U.S. 189, 194 (1971). Petitioner's fifth claim is without merit.

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because reasonable jurists would not find this Court's assessment of petitioner's claims to be debatable or wrong. *Johnson v. Smith*, 219

F. Supp. 2d 871, 885 (E.D. Mich. 2002). The Court will also deny petitioner leave to appeal *in forma pauperis*, because the appeal would be frivolous. *Allen v. Stovall*, 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

## IV.  CONCLUSION

Accordingly, the Court DENIES WITH PREJUDICE the petition for a writ of habeas corpus. The Court further DENIES a certificate of appealability and leave to appeal *in forma pauperis*.

**SO ORDERED.**


s/Paul D. Borman                              
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  April 20, 2018

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 20, 2018.


s/Deborah Tofil                               
Case Manager